

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
06/25/2007

| IN RE: | § | |
|---|---|---|
| ALLIED PROPERTIES, LLC | § | CASE NO: 06-33754 |
| Debtor(s) | § | |
| | § | CHAPTER 7 |

## MEMORANDUM OPINION

Randy W. Williams, the Chapter 7 Trustee in this case, seeks approval of a compromise with PIM Black Mountain Domestic Venture I, LLC ("Black Mountain").  Ridge Financing Servicing Corp. ("Ridge") opposes the proposed compromise.  Ridge and Black Mountain are each creditors of Allied's estate.  For the reasons set forth in this memorandum opinion, approval of the proposed compromise is denied, without prejudice.

### Summary

The following is a summary of the principal elements of the proposed compromise:

| The Estate Receives | Black Mountain Receives |
|---|---|
| Full release from Black Mountain | Residual Cash on which Black Mountain already has a lien |
| Residual proceeds from a lawsuit against debtor's principal after Black Mountain is paid in full, which proceeds are payable directly to creditors. | Claims against the proposed purchaser of Black Mountain's collateral, on which claims Black Mountain already has a lien. |
| | Rights to sue the debtor's principal for causes of action owned by the estate. |

The estate receives no benefits from the compromise.  Black Mountain's release of the estate is worthless.  The estate is administratively insolvent.  The funds being made available for payment of administrative claims have already been provided pursuant to prior orders of the Court.  Similarly, Black Mountain's agreement to pay lawsuit residuals to the estate's other creditors is not worth a peppercorn.  Since the estate is receiving nothing of value, it cannot

1

transfer away its rights to sue Dr. Rashid in a manner that prefers Black Mountain over other estate creditors.

## Facts

1. **Background.** Allied Properties, LLC ("Allied") was formed on April 6, 2006 by Dr. Muhammad Haroon Rashid. Rashid was Allied's sole member. Rashid formed Allied for the apparent purpose of acquiring two properties previously held by Global Empire Investments and Holdings, LLC ("Global"). Dr. Rashid was also Global's sole member. On December 6, 2005, Global filed for chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of Texas, case # 05-95389. Centrum Financial Services, Inc. ("Centrum") held a lien on Global's two properties: Galleria Corridors 1 and 2 ("Galleria properties"). After receiving relief from the automatic stay, Centrum foreclosed on the Galleria properties. Centrum then sold the Galleria properties to Rashid's new corporation, Allied.

To purchase the Galleria properties, Allied secured financing from PIM Black Mountain Domestic Venture I, LLC ("Black Mountain"). On April 13, 2006, Allied executed a promissory note for $15,000,000. The note was secured by a perfected first priority mortgage lien and security interest in the property, and perfected first priority lien and security interest in Allied's rents, income, and profits.

Allied immediately defaulted. On June 20 and 22, 2006, Black Mountain informed Allied of its intent to accelerate the note and foreclose on the property. Foreclosure was planned for August 1, 2006. Approximately two hours before the foreclosure proceedings, Allied filed its chapter 11 petition that commenced this bankruptcy case.

To preserve the properties' commercial viability, Black Mountain advanced approximately $50,000 for insurance and electricity. Black Mountain also entered into a

Security and Lockbox Agreement that required Galleria tenants to direct all rental payments to the Lockbox. Black Mountain and the Trustee allege that Dr. Rashid may have violated this agreement by converting or misdirecting Lockbox funds.

Allied's petition listed only two assets: Galleria Corridors 1 and 2. Allied's schedules listed 30 unsecured creditors, owed $1,424,907.58 in total unsecured debt. Ridge Financing Servicing Corp. ("Ridge") holds an unsecured claim representing $1,265,000 of that total. Black Mountain is Allied's only secured creditor, holding the $15,000,000 promissory note. Allied listed no unsecured priority claims.

Ridge alleges that its $1,265,000 claim is the result of fraud by Dr. Rashid. According to Ridge, Rashid committed fraud against Ridge by engaging in unauthorized post-petition activities related to the Global bankruptcy. Rashid had signed a $1,265,000 promissory note to Ridge, secured by the Galleria properties. As part of the same transaction, Global executed a Deed of Trust, Security Agreement, Fixture Filing, Financing Statement and Assignment of Rents. However, Ridge alleges that Rashid never informed Ridge that Global was in bankruptcy until Global defaulted on the note. Moreover, Rashid effectively stripped Ridge's lien by selling the Galleria properties to Allied for $12,500,000.

On August 10, 2006, Black Mountain filed a motion for relief from the stay to foreclose on the Galleria properties. On September 27, 2006, the Court issued a memorandum opinion denying Black Mountain's motion. The Court denied the motion because Black Mountain appeared to have equity in the properties (the uncontested valuation of the Galleria properties ($20,000,000) exceeded Black Mountain's $15,000,000 lien) and there was no evidence that the property was declining in value. However, the Court did authorize Black Mountain to act as a

3

mortgagee-in-possession of the properties. The Court believed that this order would best maximize sale proceeds by ensuring that the properties could be sold in an orderly fashion.

On October 13, 2006, the case was converted to a chapter 7. Soon thereafter, the Trustee was forced to seek financing from Black Mountain. The properties were not generating income sufficient to meet expenses because of the properties' dilapidated state and disorganized management. On October 20, 2006, Black Mountain advanced approximately $58,000 to allow the Trustee to pay outstanding utility and janitorial bills. The Court granted priority administrative claim status for this post-petition debt. The Court also authorized the Trustee to incur up to $150,000 of additional DIP-financing from Black Mountain, secured by liens on all of Allied's leases, accounts, contract rights, and all other property of the chapter 7 estate.

On December 14, 2006, the Court issued an order authorizing sale of the Galleria properties free and clear of all liens, claims, interest and encumbrances. Five bidders participated in the auction. Kailas Investments, apparently a third party to the case, was the successful bidder based on a $6,500,000 bid. Kailas deposited $250,000 with the Trustee pursuant to the Court-ordered bid procedures. However, Kailas failed to close the sale. Consequently, the $250,000 deposit was forfeited to the Trustee, and the Galleria properties were sold to the back-up bidder (Trifish LLC) for $5,700,000. Of the $5,700,000, Black Mountain received approximately $4,900,000 as proceeds of its collateral and $100,000 was paid to Black Mountain on account of its Court-approved DIP-financing. The remaining proceeds were reserved to pay statutorily-required administrative fees, and the fees and expenses of the Trustee and the Trustee's professionals.

After the Galleria properties were sold and the proceeds distributed, the bankruptcy estate was left with few assets. The bankruptcy estate currently holds only the following tangible

assets: (1) approximately $553,000 in cash reserved from sale proceeds and rent income, and (2) the $250,000 Kailas deposit. Additionally, the estate holds rights to various causes of action, including a pending cause of action against Black Mountain and the substitute trustee on Black Mountain's pre-petition aborted foreclosure.

On July 27, 2006, Allied Properties and Dr. Rashid filed a state court lawsuit against Black Mountain and the substitute trustee, seeking to enjoin foreclosure on Allied's property and asserting breach of contract and fraud claims. Black Mountain filed a counterclaim for breach of contract, conversion, fraud, and default on their loan. The lawsuit was removed to this Court and remains pending.

2. **Proposed Compromise.** Following the sale, Trustee filed a motion to compromise between the estate and Black Mountain. Under the compromise, Trustee proposed to:

> A. Transfer the $250,000 Kailas deposit to Black Mountain;
>
> B. Transfer the estate's cash balance to Black Mountain, after fees and expenses of the Trustee and his professionals are paid;
>
> C. Transfer to Black Mountain all estate-owned claims and causes of action, including those:
>
> (i) arising under chapter five of the Bankruptcy Code;
>
> (ii) against Rashid relating to pre and post-petition operation of the Galleria property;
>
> (iii) related to Kailas's failed purchase of the Galleria property; and
>
> (iv) related to any proofs of claim filed in the bankruptcy case.
>
> D. Dismiss with prejudice all claims that have or could be asserted against Black Mountain and the substitute trustee, and
>
> E. Remand all clams relating to the Rashid lawsuit to state court.

In return, Black Mountain proposed to:

      A. Distribute to the unsecured creditors any recovery it obtains from pursuit of the estate's cause of action to the extent those funds exceed Black Mountain's allowed claim, and

      B. Provide the Trustee with a full and final release.

**3. Objection.** Ridge objected to the proposed compromise, contending that the compromise was not fair, equitable, or in the best interests of the creditors because the compromise is "one-sided". On May 15, 2007, the Court held a hearing on the compromise.

## Jurisdiction

This Court has jurisdiction over this motion pursuant to 28 U.S.C. § 1334. The United States District Court's standing order of reference refers these matters to the bankruptcy judges for this district pursuant to 28 U.S.C. § 157.

## Law

1. **Standard**. Federal Bankruptcy Rule 9019 authorizes bankruptcy courts to approve compromises and settlements.[1] Ultimately, a compromise must be "fair, equitable, and in the best interest of the estate." *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980) (citing *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968)).

2. **Factors.** When considering whether a compromise is "fair, equitable, and in the best interest of the estate", the Court must weigh the "terms of the compromise with the likely rewards of litigation". *Id*. Within the 5th Circuit, lower courts must consider:

    (1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law,

    (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and

---

[1] The Rule provides: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct". FED. R. BANKR. P. 9019(a).

    (3) All other factors bearing on the wisdom of the compromise.

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc.* (*In re Cajun Elec. Power Coop.*), 119 F.3d 349, 356 (5th Cir. 1997); *Jackson Brewing*, 624 F.2d at 602.

    The 5th Circuit has articulated two additional specific factors from the general "bearing on the wisdom of the compromise" factor:

    A. The Court must consider whether the compromise serves "the paramount interest of creditors with proper deference to their reasonable views." *Cajun Elec.*, 119 F.3d at 356; *In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) (citing *Drexel v. Loomis*, 35 F.2d 800, 806 (8th Cir. 1929)). When applying this factor, courts generally consider the consideration offered by the settling creditor and the degree to which creditors object. *See Cajun Elec.*, 119 F.3d 349; *Foster Mortgage*, 68 F.3d 914; *U.S. v. AWECO, Inc.*, 725 F.2d 293 (5th Cir. 1984).

    B. The Court must consider "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion" *Foster Mortgage*, 68 F.3d at 918.

    3. **Burden.** The Trustee bears the burden of establishing that the balance of the above factors leads to a fair and equitable compromise. *In re Lawrence & Erausquin, Inc.*, 124 B.R. 37, 38 (Bankr. N.D. Ohio 1990) (citing *In re Hermitage Inn, Inc.*, 66 B.R. 71, 72 (Bankr. D. Colo. 1986)); *In re GHR Companies, Inc.*, 50 B.R. 925, 931 (Bankr. D. Mass. 1985). The burden is not high. The Trustee need only show that his decision falls within the "range of reasonable litigation alternatives". *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2nd Cir. 1983), cert. denied, 464 U.S. 822, 104 S.Ct. 89; *Cook v. Waldron*, 2006 WL 1007489 at *4 (S.D. Tex. Apr. 18, 2006); *Nellis v. Shugrue*, 165 B.R. 115 (S.D. N.Y. 1994). After all, "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly". *Cajun Elec.c*, 119 F.3d at 354 (quoting *Jackson Brewing*, 624 F.2d at 602).

The decision to approve a compromise "lies within the discretion of the trial judge". *AWECO*, 725 at 297. The Court need not "conduct a mini-trial to determine the probable outcome of any claims waived in the settlement". *Cajun*, 119 F.3d at 355. However, the Court must actually use its discretion. The Court can not "simply accept the trustee's word that the settlement is reasonable, nor may he merely 'rubber-stamp' the trustee's proposal". *In re American Reserve*, 841 F.2d 159, 162 (7th Cir. 1987) (quoting *TMT*, 390 U.S. at 434). The Court "must be informed of all relevant facts and information in order to make an independent judgment as to whether settlement is fair and reasonable under the circumstances". *Cook*, at *4. *See also, AWECO*, 725 F.2d at 299 ("The duty of a bankruptcy judge to reach an 'intelligent, objective and educated evaluation" of settlements cannot be carried out absent a sufficient factual background") (quoting *In re Jackson Brewing Co.*, 624 F.2d at 602).

## Analysis

Under the circumstances of this case, the Court concludes that the compromise cannot be approved. Most provisions of the proposed compromise are "fair, equitable, and in the best interest of the estate." However, two provisions do not meet this standard. The Court will not sever individual components of a compromise. Consequently, the Court does not approve the compromise as currently proposed.

1. **Probability of Success in the Litigation.** The Court separately analyzes the estate's potential claims:

> A. ***Claims against Black Mountain.*** The Trustee testified that the estate's claims against Black Mountain are frivolous. Essentially, they were brought only for bargaining and litigation leverage. Ridge does not dispute this testimony. The Court agrees.
>
> B. ***Claims against Rashid.*** The Trustee's testimony focused more on the improbability of *recovering* on the Rashid claims rather than the improbability of successfully *prosecuting* the claims. The Trustee based his estimation on

8

the following facts: (a) Rashid's businesses have been through multiple bankruptcies and Rashid presently faces numerous lawsuits filed against him personally; (b) it is questionable whether the estate has a legitimate cause of action against Rashid, and (c) if any entities have legitimate causes of action against Rashid, they are the individual creditors, namely Black Mountain and Ridge.

The Court agrees that the Rashid claims may not be worth millions of dollars. However, neither does the Court find the claims to be worthless. Indeed, Rashid has not yet *personally* filed a bankruptcy petition.

**C. *Claims against Kailas.*** The Kailas cause of action is also unlikely to be successful. The issue in any lawsuit against Kailas would be whether the $250,000 forfeiture was the sole remedy against a defaulting purchaser or whether the defaulting purchaser could be held liable for additional damages. The Trustee's testimony noted that the estate's only remedy may be the $250,000 forfeiture already obtained. The provision in Kailas's contract providing for the $250,000 might be deemed a liquidated damages clause. If so, the non-breaching party may not be able to pursue actual damages in addition to the liquidated damages. RICHARD A. LORD, WILLISTON ON CONTRACTS, § 65:32 (4th ed. 1990). Neither Ridge, nor any other creditor provided the court with case-law or statutory authoring defining a cause of action that could be pursued against Kailas. Most importantly, as discussed below, any damages collected from such a lawsuit are likely part of Black Mountain's collateral package and would not provide any benefit to the estate.

**D. *Claims and Causes of Action Arising Under Chapter 5 and Related to Proofs of Claim.*** The Trustee bears the burden of demonstrating a compromise's validity. The Trustee has not met his burden. The Trustee offered no evidence relating to the existence or value of any claims the estate may have under Chapter 5 or claims related to proofs of claims.

2. **Complexity, Duration, Expense and Inconvenience of Litigation.** This factor favors most of the proposed compromise's provisions. The estate has no assets with which to pursue any causes of action. The Trustee is unlikely to find a creditor willing to finance litigation because all the causes of action are based on questionable merits and against entities that are unlikely to satisfy a judgment. No creditor has offered to finance any litigation. Consequently, for an estate lacking any unencumbered assets, the *expense* of litigating any of the

9

causes of action is cost-prohibitive. Additionally, the difficulty of obtaining financing for litigation makes litigation *inconvenient*, if not impossible.

    A. ***Claims against Black Mountain.*** Because the claims against Black Mountain lack merit, the second factor also favors compromise. Any expense and delay caused by meritless litigation against Black Mountain would be wasteful.

    B. ***Claims against Rashid.*** The estate has no assets with which to pursue the Rashid cause of action. The Trustee would have to acquire financing, and no creditors have suggested they would be willing to provide this financing. Considering the improbability of recovering from Rashid, the Court seriously doubts that any creditor would offer to finance the litigation. Additionally, even if the estate had unencumbered assets with which to pursue the cause of action, it is unlikely that the Trustee would be able to pursue litigation.

    C. ***Claims against Kailas.*** Again, because the estate has no assets with which to pursue any litigation, financing would be required. To date, Ridge has not offered to finance any of the estate's causes of action. Though Ridge contended they were never given the opportunity to offer to finance the Kailas cause of action, the fact remains they did not and have not to date affirmatively stated that they actually *would* finance the litigation.

    For good reason. Even Ridge admitted that the maximum damages for the Kailas cause of action would be $550,000 (the difference between Kailas's bid and the back-up bid minus the deposit). This maximum $550,000 recovery would then be reduced by litigation fees and expenses. The Trustee stated that litigation costs would not be unsubstantial. The defendant resides outside of Texas and has asserted that he would vigorously defend rather than settle any suit. Because the recovery would be the estate's only unencumbered asset, the recovery would also be reduced by administrative and the Trustee's professional fees and expenses that would continue to incur while the litigation was pursued. The remainder of the recovery, if any, would then be distributed pro rata among the unsecured creditors. Black Mountain is the largest unsecured creditor, holding a claim worth almost $10,000,000. Ridge holds a claim worth $1,200,000.

    The remaining unsecured claims total approximately $100,000. Thus, Ridge would only be entitled to approximately 10% of any recovery. The Court finds it improbable that Ridge or any creditor *other than* Black Mountain would ever finance a cause of action that is: questionable on the merits, expensive, time-consuming, and holds a pro rata worth in the low tens-of-thousands. Unless it can be financed, the litigation has no potential value to the estate. Most importantly, as discussed below, any damages collected from such a lawsuit are likely part of Black Mountain's collateral package and would not provide any benefit to the estate.

>   **D.** ***Claims and Causes of Action Arising Under Chapter 5 and Related to Proofs of Claim.*** The Trustee offered no evidence relating to the existence or value of any claims the estate may have under Chapter 5 or claims related to proofs of claims.

**3. Other Factors Bearing on the Wisdom of the Compromise.** This factor weighs against the proposed compromise. This factor focuses on the degree to which the compromise serves *all* creditors' interests. The compromise provides *no* material benefits to the estate. Consequently, to the extent that the compromise gives Black Mountain assets that otherwise would be distributed pro rata among all the estate's unsecured creditors, the compromise violates the third factor.

*Benefits to the Estate.* Ridge correctly notes that the compromise provides the estate no material benefits. The Trustee contends that the compromise does benefit creditors for two reasons. First, the compromise will allow the Trustee to expeditiously close the case by resolving most unresolved matters. Second, the compromise does not place unsecured creditors any worse off than they would be after the case's closure because: (a) in the unlikely event that Black Mountain recovers anything from Kailas or Rashid, Black Mountain will distribute any recovery that exceeds the value of Black Mountain's allowed claim.

The Court does not find Black Mountain's agreement to distribute a recovery exceeding their allowed claim to be of any consideration. Black Mountain's outstanding allowed claim is nearly $10,000,000. The Trustee testified that it is unlikely that *anything* could be recovered from Rashid. The probability that Black Mountain will recover over $10,000,000 is low enough to characterize this provision of the agreement as valueless.

Moreover, Black Mountain's release of the estate can not reasonably be considered valuable consideration. The estate has no assets. A release of any entity with no assets has no value.

Finally, the Trustee correctly notes that the compromise will hasten the bankruptcy case's closure. However, a speedy closure only provides tangible benefits to entities that will receive a final distribution from the estate. Under the proposed compromise, only Black Mountain will receive any distributions. Moreover, the same expeditious closure benefit can be obtained by proposing an amended compromise that does serve the creditors' best interests. Expeditious closure is a worthy goal, but not a goal that can be obtained at creditors' expense.

***Benefits to Black Mountain.*** However, the compromise still would not violate the creditors' paramount interests if the only valuable assets the compromise gives Black Mountain are assets that it was already entitled to receive. A one-sided compromise is not contrary to the creditors' paramount interests if the rights are one-sided. If the compromise merely gives Black Mountain what the Trustee was obligated to give Black Mountain independently of the compromise, then neither Ridge nor any other creditor can reasonably complain that the compromise is inappropriate. A trustee has no duty to pursue litigation that is frivolous or harassing.

To a large extent, the compromise does merely *recognize* Black Mountain's existing rights. Only Black Mountain has rights to the estate's tangible assets and certain causes of action. However, the compromise also gives Black Mountain causes of action that otherwise would have benefited all unsecured creditors. Those provisions of the compromise do not merely *recognize*, but *create* rights. Consequently, those provisions cannot be approved when there is no corresponding estate benefit. The individual components are as follows:

12

A. ***Cash Balance.*** Black Mountain has the exclusive right to the estate's ending cash balance. All of the approximately $500,000 remaining in the estate was generated from the sale of the Galleria properties. Black Mountain held a secured interest in the Galleria properties. After a secured creditor's collateral is sold, a creditor's security interest attaches to the sale proceeds. TEX. BUS. AND COM. CODE, §9.315. Consequently, the cash balance is Black Mountain's collateral[2] and the compromise does no injustice by recognizing this fact.

B. ***Kalais Deposit.*** The $250,000 Kalais deposit is subject to greater dispute. Ridge contends that the deposit is not proceeds from the sale, but belongs to the estate as an unencumbered asset. As an unencumbered asset, Black Mountain would not hold exclusive right to the deposit. Rather, Black Mountain, Ridge, and the remaining general unsecured creditors would share the $250,000 on a pro rata basis. Black Mountain contends that it alone has rights to the Kalais Deposit. Black Mountain characterizes the deposit as proceeds from the Galleria properties' sale. Because Black Mountain held a security interest in the properties, that security interest carried over to all proceeds from the sale, including the deposit.

Both parties directed the Court to case-law considering whether a forfeited deposit constitutes proceeds of a secured creditor's collateral or an unencumbered asset of the estate. A Vermont district court held that the deposit forfeited by an initial winning bidder was an unencumbered asset of the estate. *In re Vermont Knitting Co.*, 111 B.R. 464 (Bankr. D. Vt. 1990). However, the 4th and 11th Circuits, as well as a Texas District and Illinois District Court, have characterized forfeited deposits as proceeds. *Old Stone Bank v. Tycon I Bldg. Ltd.*, 946 F.2d 271 (4th Cir. 1995); *In re Aldersgate Found., Inc.*, 878 F.2d 1326 (11th Cir. 1989); *Summit Nat. Bank v. Spicer*, 2002 WL 737145 (N.D. Tex. Apr. 23, 2002); *In re Vandevender*, 87 B.R. 59 (Bankr. S.D. Ill. 1988). The Court finds the latter reasoning more persuasive, especially considering Texas's broad definition of proceeds.

Moreover, even if the deposit is treated as an unencumbered asset, unsecured creditors would have no right to the funds. The Bankruptcy Code requires payment of administrative expenses prior to payment of unsecured pre-petition claims. The Trustee testified that he is owed statutory prescribed fees equaling approximately $200,000. Professional fees and expenses equal $70,000-$80,000. If the Kailas deposit is characterized as an unencumbered asset, it would be the *only* unencumbered asset in the estate. Consequently, Trustee fees and expenses would be paid from the deposit. Because those fees and expenses exceed the deposit's value, neither Ridge, other unsecured creditors, nor even Black Mountain, would receive any distribution from the deposit.

---

[2] Separate orders, not relevant here, allow the collateral to be charged with some estate expenses. Those orders do not affect the validity of Black Mountain's lien in the residual cash.

13

C. ***Claims Against Kailas.*** Transfer of the Kailas cause of action also only *recognizes* Black Mountain's existing interests. Two independent reasons support this conclusion:

(i) As discussed earlier, the Kailas action has questionable value. Even if a valid cause of action exists, the expense of pursuing the litigation might be cost prohibitive.

(ii) Moreover, any recovery would belong to Black Mountain as proceeds arising from Black Mountain's collateral. There is no logical reason why the cause of action arising from the breach of a purchase agreement should be treated differently than the forfeited earnest money deposit analyzed above. Although the Court is unable to locate specific authority on this analogy, the Court notes that both are merely measures of damages from the breach of an agreement to purchase Black Mountain's collateral. If Kailas had performed under his contract, it is undisputed that all of the proceeds of its performance would have been Black Mountain's collateral. The measure of damages in the Kailas lawsuit is the difference between the amount of the ultimate sales proceeds and the amount set forth in the contract with Kailas. This claim is part of Black Mountain's collateral. Ridge has no legitimate complaint with this part of the proposed compromise. *See Old Stone Bank*, 946 F.2d 271; *Aldersgate,* 878 F.2d 1326; *Summit Nat. Bank*, 2002 WL 737145; *Vandevender*, 87 B.R. 59. This conclusion is also supported by the Texas Business and Commercial Code's expansive definition of "proceeds" as including the following property:

> (A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;
>
> (B) whatever is collected on, or distributed on account of, collateral;
>
> (C) ***rights arising out of*** collateral;
>
> (D) to the extent of the value of collateral, ***claims arising out*** of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to the collateral; or
>
> (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to the collateral.

§ 9.102(a)(65) (2006).

D. ***Claims Against Rashid.*** It is certainly true that creditors—including Ridge and Black Mountain—may own direct claims against Rashid. Those direct

claims are not affected by the proposed compromise. *See In re Educators Group Health Trust,* 25 F.3d 1281, (5th Cir. 1994). Nevertheless, the estate has its own potential causes of action against Rashid. The proposed compromise transfers the estate-owned Rashid causes of action to Black Mountain.

Black Mountain has no special entitlement to the cause of action. It has no lien against the causes of action; they are not proceeds of Black Mountain's collateral. These claims are owned by the trustee, free and clear. Transferring the causes of action to Black Mountain places Black Mountain above similarly situated unsecured creditors. If Black Mountain holds the rights to the cause of action, it will receive 100% of the recovery, rather than a pro rata percentage shared with the remaining unsecured creditors.

It is neither fair nor equitable to give a single unsecured creditor the rights to a cause of action without requiring consideration to the estate in return. As discussed above, Black Mountain's promise to pay unsecured creditors to the extent it recovers an amount exceeding its allowed claim is valueless. Consequently, Black Mountain gives the estate no benefits under the compromise. The Trustee has not offered and the Court does not find a just reason to simply *give* away these rights to Black Mountain opposed to any other creditor.

E. ***Claims and Causes of Action Arising Under Chapter 5 and Related to Proofs of Claim.*** As with the Rashid causes of action, Black Mountain does *not* have a claim to these causes of action greater than any other unsecured creditors. Absent consideration from Black Mountain, the Court can not find this provision to be in the creditor's best interests.

***Deference to Creditor Views.*** The Court is also required to consider the creditors' views. Allied's schedules listed 30 unsecured creditors. Only Ridge objected. The Court recognizes that "desires of the creditors are not binding." *Foster*, 68 F.3d at 917 (citing *In re Transcon. Energy Corp.*, 764 F.2d 1296, 1299 (9th Cir. 1985). The Court is obliged to independently consider whether the creditor's best interests are being served. *AWECO*, 725 F.2d at 299 ("[T]he court must act independently, out of its own initiative, for the benefit of all creditors.") (quoting *In re Boston & Providence R.R. Corp.*, 673 F.2d 11, 13 (1st Cir. 1982). The Court has carefully considered Ridge's views. With respect to most of the compromise's terms, the Court cannot sustain Ridge's position. Nevertheless, because the terms of the proposed compromise are not

15

severable, Ridge's views compel the Court to decline to approve the compromise as currently proposed.

*Arm's-Length Bargaining.* Though Ridge disputes the compromise's fairness, the compromise was formed at arms length and without collusion or nefarious intent.

## Conclusion

For the above reasons, Trustee's motion to compromise is denied, without prejudice. The Trustee and Black Mountain are granted leave to file an amended motion that either:

    A. deletes the transfer of (a) the estate's claims against Dr. Rashid; and (b) the chapter 5 causes of action; or

    B. provides for a tangible benefit to the estate.

A separate order denying approval of the compromise will be issued.

Signed at Houston, Texas, on June 25, 2007.

MARVIN ISGUR
United States Bankruptcy Judge